ROBERT DOUGLAS HAYDEL, JR.
v.
TAMMY THERIOT FRANK BONNER HAYDEL
No 2008 CA 0245
Court of Appeals of Louisiana, First Circuit.
October 31, 2008
NOT DESIGNATED FOR PUBLICATION
KATHRYN S. LIRETTE, JOAN M. MALBROUGH, VANESSA L. ZERINGUE, AMANDA L. MUSTIN, Counsel for Plaintiff/Appellee, Robert Douglas Haydel, Jr.
STEPHEN S. STIPELCOVICH, MICHAEL J. SAMANIE, Counsel for Defendant/Appellant, Tammy Theriot Frank Bonner Haydel.
Before: WHIPPLE, GUIDRY, McDONALD, HUGHES, and WELCH, JJ.
GUIDRY, J.
Defendant, Tammy Theriot,[1] appeals a judgment rendered in favor of her former husband, Dr. Robert Haydel, Jr., that revoked various donations inter vivos Dr. Haydel had made to her prior to their marriage, after the trial court found that Ms. Theriot's conduct rose to the level of cruel treatment or grievous injuries, as required by LSA-C.C. art. 1559(1) and LSA-C.C. 1560(2). For the reasons that follow, we affirm the judgment of the trial court.

BACKGROUND
Dr. Haydel and Ms. Theriot were married on May 10, 2006, in Honolulu, Hawaii, but maintained their matrimonial domicile in Terrebonne Parish, Louisiana. No children were born of the marriage, and the parties physically separated approximately four and a half months later, on or about September 24, 2006. Dr. Haydel filed a petition for divorce on September 25, 2006, and the parties were subsequently divorced by judgment dated April 25, 2007.
On November 22, 2006, prior to the granting of the judgment of divorce, Dr. Haydel filed a petition for revocation of a donation inter vivos. In this petition, Dr. Haydel alleged the parties separated because of "cruel treatment and grievous injuries" that Ms. Theriot inflicted upon him in an incident that occurred on the night of their separation.[2] Specifically, Dr. Haydel alleged that Ms. Theriot engaged in the following acts on that particular night: (1) verbally harassing him about money and money-related issues, to such an extent as to make him emotionally distraught; (2) calling the police to have him physically removed from his separate property; (3) telling him that she no longer loved him and that she could have any man she wanted, including a richer man; (4) impugning his manhood; (5) flirting with other men; and (6) acting belligerently toward him to such an extent that he was put out of the vehicle and had to walk from around the Cypress Columns to State Police Troop C in the middle of the night. As a result of these acts of alleged cruel treatment and grievous injury, Dr. Haydel sought to revoke various donations he had made to Ms. Theriot prior to and in contemplation of their marriage. At issue were diamond earrings, a Tag Heur watch, a diamond engagement ring, a wedding band, pearl earrings, a pearl ring, a pearl and diamond necklace, and a pearl necklace.
Ms. Theriot answered the petition for revocation generally denying most of the allegations of the petition. In addition, Ms. Theriot alleged that she, and not Dr. Haydel, had been the victim of cruel treatment and grievous injuries. Regarding the six specific acts of ingratitude alleged by Dr. Haydel, Ms. Theriot denied that she had harassed Dr. Haydel about money and averred that he was the one with the spending problem. She acknowledged that the police were present at the residence on the evening in question, but she contended that it was the police who requested that Dr. Haydel leave the premises due to his hostile behavior; Ms. Theriot specifically denied that she had made any such request. She admitted having impugned Dr. Haydel's manhood, acknowledging that such comments were made "in the heat of the moment;" however, she flatly denied ever having flirted with any other man at any time during the parties' marriage. Ms. Theriot also denied having told Dr. Haydel that she could have any other man she wanted; rather, she claimed that he had boasted to her about the many different women he had been with in his life, many of whom were "so much prettier" than Ms. Theriot. Finally, Ms. Theriot stated that she requested that Dr. Haydel leave the vehicle due to the verbal abuse and belligerent behavior he had directed at her that evening. She contended that Dr. Haydel's conduct caused her to fear for her safety, because he allegedly had physically assaulted her while angry at her on the night of their wedding.
The record reveals that the parties' brief marriage was troubled from the beginning, and in addition to both parties, several witnesses testified regarding the parties' general incompatibility. However, the grounds and bases for the filing of the revocation action were the events that occurred on September 23, 2006.
The record reveals that on that date, the parties went to the wedding reception of a friend. They arrived at the wedding reception at around 2:30 or 3:00 p.m. and stayed for about three hours. By both of their accounts, they enjoyed being together at the reception until it was time to leave. The parties dispute what happened to change the mood, but both acknowledge that they had been drinking and words were exchanged. Dr. Haydel testified that he was tired and wanted to go home, but that Ms. Theriot was having trouble deciding whether she wanted to take him home or stay with her friends and let him go home alone. Ultimately, the couple left the reception together, with Ms. Theriot driving. Dr. Haydel claimed that Ms. Theriot then became violent and struck him several times with an open hand,[3] cursed him, and began verbally insulting him. He claimed that without provocation, she told him in the car that he did not mean anything to her and that she could find another man better than him any time she wanted. She also insulted his manhood. He claimed that she continued to strike him, until she almost veered into a ditch. He also claimed that she pulled over, ordered him out of the car, and drove away. He stated that by that time, he was ready to get out of the car "to avoid any further drama," but then claimed that he was forced to walk to the State Police Troop C Complex to use the phone to get a ride home. Dr. Haydel acknowledged that he responded to Ms. Theriot's insults and curses in kind. He further testified that he persistently suggested to Ms. Theriot that she go spend the night at her parent's home and sleep it off. According to Dr. Haydel, he called Ms. Theriot's parents and asked them to come to the house, pick up Ms. Theriot, and take her to their home to spend the night in an effort to keep the matter from escalating that night, and they could talk things over in the morning. However, even after Ms. Theriot's parents arrived, she refused to leave with them, and instead, called the police. Dr. Haydel admitted that he would not let Ms. Theriot into their home to get her belongings, but he did offer to let her mother in the house to get some things for her. He claimed Ms. Theriot refused this offer and her insistence in calling the police to help her collect her belongings was totally unnecessary.
Ms. Theriot's account of the events that occurred that evening differs. Ms. Theriot testified that she and Dr. Haydel were enjoying their friend's reception, until Dr. Haydel became jealous that another man she did not know complimented her. According to Ms. Theriot, Dr. Haydel's mood changed dramatically after the comment, so they left. Ms. Theriot acknowledged that she had been drinking at the reception, but insisted she could drive; however, she testified that Dr. Haydel was drunk. Ms. Theriot testified that the argument started when they were in the car and Dr. Haydel started boasting about all the women he had been with before and taunting her about how much prettier they were than she. She acknowledged insulting him, and she further acknowledged that the argument became very heated; however, she flatly denied striking him. She testified that everything she said to him was only in reaction to what he had said to her as the argument escalated, and she further testified that she was sorry for having said those things. Furthermore, she stated that she had made Dr. Haydel get out of the car because she was afraid he might hurt her physically after what had occurred in an earlier incident on their wedding night.
Ms. Theriot testified that she went straight home after leaving Dr. Haydel on the side of the road. However, she left again shortly thereafter to meet a friend for drinks. She then returned to the house to find Dr. Haydel there, with her parents pulling into the driveway behind her. She testified that she called the police because Dr. Haydel refused to let her inside the house to get her belongings.
Patrolman First Class Michael Toups of the Houma Police Department was one of the police officers called to Dr. Haydel's residence that evening. Patrolman Toups testified that he and two other officers responded to the call to assist Ms. Theriot in removing her belongings from the residence. He testified that he could tell that both parties had been drinking, and that it was obvious they had been arguing. He denied that Ms. Theriot ever asked him to remove Dr. Haydel from the premises. Moreover, he testified that he had to take Dr. Haydel outside because he was yelling and was very belligerent. Patrolman Toups further stated that he threatened to arrest Dr. Haydel if he did not stop yelling. Patrolman Toups also testified that he asked the parties whether there had been any physical violence and was told by both that there had not been.
With the police there, Ms. Theriot then took her clothing and some of her personal items from the residence, including the jewelry that is the subject of the petition for revocation. Instead of going to her parents' home, she went to a hotel for the evening.
On the following Monday, September 25, 2006, Dr. Haydel filed his petition for divorce in this matter. He subsequently added the petition for revocation which is before this court now.
After a bench trial, the trial court carefully determined the actions of both parties that evening, based on the evidence presented, and determined that Ms. Theriot's conduct rose to the level of cruel treatment or grievous injuries as reflected by applicable jurisprudence. The trial court provided extensive reasons for judgment that detailed the inappropriate actions of both parties that evening. However, the trial court also noted that "Dr. Haydel's testimony was pretty consistent" In contrast, the trial court noted that "Ms. Theriot's testimony is ... consistent on certain things but then when it came to be some things that were very relevant, she couldn't remember. Couldn't remember." The trial court detailed several items of Ms. Theriot's testimony that he found inconsistent with the other evidence presented. He particularly noted several letters in evidence written by Ms. Theriot to Dr. Haydel, after the incident, in which she apologizes profusely for her inappropriate behavior, blaming it on alcohol and stating that she could not remember the events of that evening. However, at trial, Ms. Theriot claimed to have full recollection of the events that night and denied that she blamed herself in the letters, stating the letters were untruthful and she was only trying to save her marriage. The trial court also acknowledged that while both parties said things that were "mean and cruel" that night, "Dr. Haydel handled the matter in [the] very best way he could" by getting home and calling Ms. Theriot's parents in an effort to calm things down. He also remarked that Ms. Theriot called the police instead, which he deemed to be "very humiliating" to Dr. Haydel. Expressly basing his decision on these credibility calls, the trial court found that Ms. Theriot's actions that night amounted to cruel treatment and grievous injury.
Thus, by judgment signed July 11, 2007, the trial court ordered that the donations be revoked, and that the items be placed in a safety deposit box pending appeals in this matter. Ms. Theriot then filed the instant appeal.

DISCUSSION
It is well-settled that a court of appeal may not set aside a trial court's finding of fact in the absence of manifest error or unless it is clearly wrong. Moreover, where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Rosell v. ESCO, 549 So. 2d 840, 844 (La. 1989).
A donation inter vivos is an act by which the donor irrevocably divests himself of the thing given in favor of the donee who accepts it. LSA-C.C. art. 1468. However, such a donation may be revoked or dissolved for the ingratitude of the donee, among other reasons. LSA-C.C. art. 1559(1). Ingratitude is defined to cover three situations, including when the donee has been guilty towards the donor of cruel treatment, crimes, or grievous injuries.[4] LSA-C.C. 1560(2).
In defining "grievous injuries," the Louisiana jurisprudence has relied on C. Aubry & C. Rau, 3 COURS DE DROIT CIVIL FRANCAIS, § 708 at 404 (Louisiana State Law Institute Translation, 1965), which provides, in pertinent part:

Injuries include any act naturally offensive to the donor. It may be the adultery of one of the spouses .... The act may consist of slanderous charges; of a seizure levied by the donee against the donor of whom he is creditor; or, in a proper case, even of the refusal to consent to the revocation. (Footnotes omitted.)
See Erikson v. Feller, XXXX-XXXX, pp. 4-5 (La. App. 3 Cir. 12/8/04) 889 So. 2d 430, 433; Porter v. Porter, 36,007, p. 7 (La. App. 2 Cir. 6/12/02), 821 So, 2d 663, 667; Spruiell v. Ludwig, 568 So. 2d 133, 138 (La. App. 5 Cir. 1990), writ denied, 573 So. 2d 1117 (La. 1991); Perry v. Perry, 507 So. 2d 881, 883 (La. App. 4 Cir.), writ denied, 512 So. 2d 465 (La. 1987). Injuries and even simple crimes against the person of the donor are not causes for the revocation of a donation unless they exhibit a certain degree of gravity, regard being had to the circumstances and the situations of the parties. C. Aubry & C. Rau, 3 COURS DE DROIT CIVIL FRANCAIS, § 708 at 406 (Louisiana State Law Institute Translation, 1965) (footnote omitted).
The determination as to whether a donee has been guilty of cruel treatment or grievous injury toward a donor depends heavily upon the facts and circumstances specific to the case. Erikson, XXXX-XXXX at p. 7, 889 So. 2d at 434. As noted above, such a determination by the trial court cannot be overturned unless it is manifestly erroneous. In this case, it is clear that the trial court carefully considered all of the evidence presented, weighed the actions of both parties based on the testimony presented and the credibility determinations required, and compared the facts and the circumstances of this case to the relevant jurisprudence in reaching its determination that Ms. Theriot's actions rose to the level of cruel treatment and grievous injury contemplated by La. C.C. arts. 1559(1) and 1560(2) for revoking donations inter vivos. We have thoroughly reviewed the record and find that it supports the trial court's findings, and is not manifestly erroneous or clearly wrong.

CONCLUSION
For the reasons set forth above, the July 11, 2007 judgment of the trial court is affirmed. All costs of this appeal are assessed to the appellant, Ms. Tammy Theriot.
AFFIRMED.
WHIPPLE, J., dissenting.
I respectfully dissent. In my view, the actions complained of by Dr. Haydel in his petition for revocation do not rise to the level of "cruel treatment" or "grievous injuries" within the meaning of LSA-C.C. 1560(2).
As noted by the majority, in order to justify the revocation of a donation, injuries against a donor must exhibit a certain degree of gravity. See C. Aubry & C. Rau, 3 COURS DE DROIT CIVIL FRANCAIS, § 708 at 406 (Louisiana State Law Institute Translation, 1965) (footnote omitted). I find that petty bickering and name-calling between a husband and wife during an argument, although admittedly distasteful or, in some instances, hurtful, do not exhibit the appropriate degree of gravity, as a matter of law, to rise to the level of cruel treatment or grievous injuries.
Moreover, I note that the record demonstrates Dr. Haydel acknowledged that he returned Ms. Theriot's curses and insults during the argument. In my view, having engaged in such behavior, Dr. Haydel cannot now contend that he was shocked by such language or behavior; or that he suffered the level of cruelty or gravity contemplated by law. Having participated in and escalated the acts at issue, and having due regard for the overall circumstances in which these individuals conducted themselves, I do not believe that Dr. Haydel made the requisite showing that the acts complained of were so "naturally offensive" to him as to warrant the relief sought, under the facts and law applicable herein. Accordingly, it is my opinion that Dr. Haydel failed to carry his burden of proof that he suffered cruel treatment and grievous injuries. Thus, I respectfully dissent and would reverse the trial court's judgment.
NOTES
[1] The judgment of divorce in this matter authorized the defendant to resume using her maiden name, Tammy Elizabeth Theriot. Accordingly, we will refer to her as Ms. Theriot throughout this opinion.
[2] Although the petition for divorce and the petition for revocation indicate that the incident causing the separation occurred on September 24, 2006, the testimony indicates that the incident and the resulting separation occurred on September 23, 2006.
[3] We note that Dr. Haydel's allegations of cruel treatment and grievous injuries in his petition for revocation did not include any allegations whatsoever of physical violence or that Ms. Theriot had physically assaulted him on the evening in question.
[4] Ingratitude is also defined to cover the situations when the donee has attempted to take the life of the donor and when the donee has refused the donor food when in distress. LSA-C.C. art. 1560(1) and (3). None of these situations are applicable in this matter.